NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3485-14T3

DEBRA DUGAN, ALAN FOX, and
 APPROVED FOR PUBLICATION
ROBERT CAMERON on behalf of
themselves and all other March 24, 2016
similarly situated,
 APPELLATE DIVISION
 Plaintiffs-Respondents/
 Cross-Appellants,

v.

TGI FRIDAYS, INC., CARLSON
RESTAURANTS WORLDWIDE, INC.,
on behalf of themselves and
all others similarly situated,

 Defendant-Appellant/
 Cross-Respondents.

__________________________________________

 Argued February 23, 2016 – Decided March 24, 2016

 Before Judges Yannotti, Guadagno and
 Vernoia.

 On appeal from Superior Court of New Jersey,
 Law Division, Burlington County, Docket No.
 L-0126-10.

 Stephen M. Orlofsky argued the cause for
 appellants/cross-respondents (Blank Rome,
 L.L.P., and LeClair Ryan, attorneys; Mr.
 Orlofsky, David C. Kistler, Jeffrey L.
 O'Hara, and Matthew S. Schultz, on the
 briefs).

 Sander D. Friedman argued the cause for
 respondents/cross-appellants (Law Office of
 Sander D. Friedman, LLC, attorneys; Mr.
 Friedman and Wesley G. Hanna, on the
 briefs).

 The opinion of the court was delivered by

YANNOTTI, P.J.A.D.

 Defendants TGI Fridays, Inc. and Carlson Restaurants

Worldwide, Inc. (collectively, TGIF) appeal, on leave granted,

from an order entered by the Law Division on February 13, 2015,

denying their motion to reconsider class certification and de-

certify the class or, in the alternative, to revise the class

definition. Plaintiffs Debra Dugan, Alan Fox and Robert Cameron

cross-appeal from the court's order certifying the class. For

the reasons that follow, we reverse on the appeal, dismiss the

cross-appeal, and remand the matter to the trial court for

further proceedings on plaintiffs' individual claims.

 I.

 We begin our discussion with a summary of the relevant

procedural history and facts, as revealed in the record on

appeal.

 A. The Complaint.

 On January 12, 2010, Dugan filed a putative class-action

complaint against TGIF alleging that the restaurant chain

violated the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -184,

and the Truth in Consumer Contract Warranty and Notice Act

(TCCWNA), N.J.S.A. 56:12-14 to -18, by: (1) failing to list

 2 A-3485-14T3
prices for beer, mixed drinks, and soft drinks on its restaurant

menus; and (2) engaging in an unconscionable commercial practice

by charging different prices for the same beverage, depending

upon where in the restaurant the beverage was served.

 Dugan alleged that she had been a patron of TGIF's

corporate-owned restaurant in Mount Laurel and was aggrieved by

TGIF's failure to disclose the price of beverages on the

restaurant's menus. Dugan claimed she became aware of the prices

after she had consumed the beverages and was presented with a

check. Dugan also claimed that on December 5, 2008, she was

charged $2.00 for a beer at the bar and later charged $3.59 for

the same beer at a table in the restaurant.

 The proposed plaintiff class consisted of all TGIF

customers who had "purchased items from the menu that did not

have a disclosed price." The proposed defendant class consisted

of the thirty-eight TGIF restaurants in New Jersey, some of

which are corporate-owned, and some of which were are operated

as a franchise of TGIF.

 B. TGIF's Motion to Dismiss.

 In June 2010, TGIF filed a motion to dismiss the complaint

for failure to state a claim upon which relief could be granted.

The judge entered an order denying the motion. We denied TGIF's

motion for leave to appeal from the judge's order, but the

Supreme Court later granted TGIF's motion and summarily remanded

 3 A-3485-14T3
the matter to this court for consideration of TGIF's

interlocutory appeal. We affirmed the trial court's order in an

unpublished opinion. Dugan v. TGI Fridays, Inc., No. A-3098-10

(App. Div. Oct. 25, 2011) (slip op. at 20).

 We held that Dugan had alleged sufficient facts to support

a claim under the CFA, specifically a violation of N.J.S.A.

56:8-2.5, which mandates point-of-sale disclosure of the price

of merchandise at retail, and N.J.S.A. 56:8-2, which declares

certain unconscionable commercial practices to be unlawful. Id.

at 12-14. We also held that Dugan pled sufficient facts to show

that she sustained an ascertainable loss, and that TGIF's alleged

unlawful conduct was the cause of her loss. Id. at 14-18.

 We stated, "At the very least, if proven, Dugan would

logically have lost the benefit of a $2.00 beer and paid $1.59

more for the privilege of moving from the bar to a nearby

table." Id. at 17. We added that the measure of out-of-pocket

loss, which is "typically applied when [a] misrepresentation

induces a consumer to pay a higher price than is reasonable," is

the difference between the price paid and the actual value of

the property acquired. Ibid.

 We also held that the facts as alleged in the complaint

were sufficient to support a claim that TGIF's alleged failure

to include prices on its menus caused the loss. Id. at 17-18. We

noted that, in her complaint, Dugan had not expressly alleged

 4 A-3485-14T3
 (1) that she looked at the menu, discerned
 the absence of prices, and assumed a
 reasonable price lower than what she was
 eventually charged, or (2) that she
 purchased a beer at the bar, actually
 noticed that it cost two dollars, and then
 decided to buy another at a table on the
 assumption the price would be the same.

 [Id. at 17.]

 We observed that the lack of such facts might result in the

grant of summary judgment in favor of TGIF, but at that stage of

the litigation, Dugan's complaint had to be reviewed with some

indulgence. Id. at 18. We concluded that Dugan had alleged facts

establishing a sufficient factual "link between the alleged

unconscionable commercial practices and her purported injury."

Ibid.

 We also determined that Dugan had alleged sufficient facts

to state a claim under the TCCWNA. We found that Dugan was a

"consumer" as that term is defined in N.J.S.A. 56:12-15. Id. at

18-20. We found that Dugan had alleged TGIF offered her a

contract that included a provision which allegedly violated the

CFA, and "the affirmative act that may trigger [liability under]

the TCCWNA is the offer encompassed by TGIF's menu." Id. at 19-

20.

 C. The Amended Complaints.

 In December 2011, Dugan filed an amended complaint,

alleging that she purchased unpriced beverages at TGIF's Mount

 5 A-3485-14T3
Laurel restaurant on at least two occasions. Dugan claimed that

on one occasion she purchased two mixed drinks. On the other

occasion, Dugan purchased a beer at the bar, and then purchased

a beer and a soft drink at a table in the restaurant. Dugan

claimed she was not aware of the costs of the beverages until

after she had consumed the drinks and was presented with a

check.

 In March 2013, a second amended complaint was filed adding

Fox and Cameron as plaintiffs and putative class

representatives. Fox claimed that in June 2007, he ordered two

unpriced mixed drinks at TGIF's corporate-owned restaurant in

Cherry Hill. He alleged that if he had known the prices he would

be charged for the drinks, he would "have ordered something

different and certainly would not have ordered two [drinks]."

Cameron alleged that in August 2012, he ordered an unpriced beer

and soda at TGIF's franchise-operated restaurant in Toms River.

 In the second amended complaint, Dugan alleged that she had

ordered unpriced soft drinks, mixed drinks and beer at various

TGIF restaurants over the previous six years. She claimed TGIF's

practice of making an affirmative offer for the sale of

beverages without posting prices facilitated the sale of "more

beverages at a given price point than would be feasible if the

prices were disclosed." She claimed that this was "menu

engineering," which was "an intentional and carefully planned

 6 A-3485-14T3
act" designed to "exploit consumer psychology and manipulate

consumer perceptions."

 D. Discovery.

 Dugan was deposed and testified that on December 5, 2008,

she ordered a beer at the bar at TGIF's Mount Laurel restaurant,

while waiting with her friends for a table. Dugan conceded that

she did not review the menu at the bar, or review the price of

the beer indicated on the receipt before she paid the bar bill.

Dugan then ordered another beer and a soda while seated at a

table in the restaurant. She conceded that she did not read the

beverage section of the menu, did not review the final bill

before she paid it, and had no expectation of what the cost of a

beer or soda would be.

 When she returned home, Dugan reviewed the receipts. Dugan

learned that she had paid $2.00 for the beer at the bar, which

was what she said was the "happy-hour price." She paid $3.59 for

the beer at the table. She also paid what she characterized as a

"steep" price for a soda.

 Dugan later submitted a certification to the trial court,

in which she stated that she had looked at the beverage section

of the TGIF menu on many occasions. Dugan asserted that she had

expected to pay the same price for a beer at the bar and at a

table in the restaurant.

 At his deposition, Fox testified that on June 26, 2007, he

 7 A-3485-14T3
ordered three mixed drinks at the company-owned TGIF in Cherry

Hill. In his answers to interrogatories, Fox explained that he

ordered the drinks because he had had "a bad day" and wanted to

"adjust" his "attitude." Prices for the drinks were not listed

on the menu. Fox testified that he "went ballistic" when he

received the bill because he had not realized that each drink

cost $6.99. Fox said he expected to pay about $5.75 per drink.

 Fox returned with his wife to the TGIF in Cherry Hill in

January 2013 and ordered two mixed drinks and a beer. Prices for

the drinks were not listed on the menu. Fox testified that,

based on the placement of the drinks on the menu, he thought

TGIF was running a special on mixed drinks.

 In response to Fox's query, the server told him that the

mixed drinks cost $7.00 and a beer costs $5.00. When Fox

received the bill, he discovered that one mixed drink cost $7.19

and the other cost $8.20. The beer cost $5.29. Fox testified

that he thought the prices of the mixed drinks were a little

high. He stated that he was dissatisfied "with the deception"

perpetrated by TGIF.

 In its answers to interrogatories, TGIF indicated that

fourteen of the TGIF restaurants in New Jersey are company-

owned, including the restaurants in Cherry Hill and Mount

Laurel. Twenty restaurants are franchise-operations, including

the Toms River restaurant. All corporate-owned and franchise-run

 8 A-3485-14T3
restaurants in New Jersey use the same menus, which were

provided by and are subject to Carlson's approval. TGIF stated

that in accord with the "customary practice within the bar

restaurant industry," the company-owned restaurants do not list

the prices for beer, soda and mixed drinks on their menus.

However, a franchisee could post beverage prices if TGIF

authorized it to do so.

 E. Class Certification.

 In late 2012, plaintiffs filed a motion for class

certification, and TGIF thereafter filed a cross-motion for

summary judgment. The judge denied TGIF's motion for summary

judgment, and granted plaintiffs' motion to certify the class.

The judge found that plaintiffs had met the requirements for a

class action in Rule 4:32-1(a), and demonstrated both the

predominance of the common issues and superiority of a class

action over other trial techniques, as required by Rule 4:32-

1(b).

 The judge defined the class as all persons who visited a

company-owned TGIF restaurant "from January 12, 2004 to June 18,

2014, relied upon [TGIF's] menus, and purchased an offered but

unpriced soda, beer or mixed drink." The defendant class was

limited to the fourteen company-owned TGIF restaurants in New

Jersey.

 On September 5, 2014, the judge granted TGIF's motion to

 9 A-3485-14T3
dismiss Cameron as a class representative. The judge found that

Cameron did not fit within the class definition since he

allegedly ordered unpriced beverages at a franchise-owned TGIF.

The judge also extended the cut-off time for claims to July 14,

2014, the date Carlson sold the TGIF chain of restaurants to new

owners, who were not named in the complaint.1

 F. Motions to redefine the class, and for Reconsideration
 or Decertification of the Class.

 In November 2014, plaintiffs filed a motion to amend the

class definition for purposes of preparing notices to class

members. Plaintiffs sought to remove the requirement that the

class member "relied upon" TGIF's menu, and to define the class

as any customer who purchased an unpriced beverage during the

relevant time period. The judge granted the motion and found

that the class members need not show reliance to pursue claims

under the CFA and TCCWNA.

 On December 23, 2014, the judge entered an order approving

the notices for class members. The order also changed the

definition of the class to include: "All persons who visited [a]

TGI Friday's restaurant in New Jersey that is owned by TGI

Friday's (i.e. company owned store) from January 12, 2004 to

July 14, 2014, and purchased an offered but unpriced soda, beer

1 The new owners are Sentinel Partners, LLC, and TriArtisan
Capital Partners, LLC.

 10 A-3485-14T3
or mixed drink."

 In January 2015, TGIF filed a motion to reconsider class

certification and decertify the class or, in the alternative, to

revise the class definition. By order entered February 13, 2015,

the judge denied the motions. The judge ordered class

notification to begin on February 20, 2015.

 G. The Appeal and Cross-Appeal.

 TGIF filed a motion with this court for leave to appeal the

trial court's orders of December 23, 2014 and February 13, 2015,

and to stay class notification. We denied TGIF's motions.

Thereafter, the Supreme Court stayed class notification, granted

TGIF's motion for leave to appeal, summarily remanded the matter

to this court for consideration of the merits of the appeal, and

stayed further trial court proceedings pending a decision on the

appeal.

 On appeal, TGIF argues that the trial court erred by

denying its motion to reconsider class certification and

decertify the class because plaintiffs failed to meet the

requirements for maintaining a class action under the court

rules. In the alternative, TGIF argues that the trial court

erred by refusing to revise the definition of the class to

require that each class member has read TGIF's menu before

purchasing an unpriced beverage.

 In their cross-appeal, plaintiffs argue that the trial

 11 A-3485-14T3
court erred by limiting the class to persons who purchased

unpriced beverages at TGIF's company-owned restaurants;

excluding purchasers of coffee, tea and miscellaneous beverages

from the class; and excluding persons who purchased unpriced

soda, beer and mixed drinks after July 14, 2014.

 II.

 We begin our analysis with the general standards that

govern our review of the trial court's certification order, and

the requirements in our court rules for maintaining a class

action.

 The decision on whether to certify a class rests in the

sound discretion of the trial court. Lee v. Carter-Reed Co.,

L.L.C., 203 N.J. 496, 506 (2010). In making that decision, the

trial court must accept as true the allegations in the complaint

and cannot decide "the ultimate factual issues underlying the

plaintiff's cause of action." Id. at 505 (quoting Riley v. New

Rapids Carpet Ctr., 61 N.J. 218, 223 (1972) (internal quotation

marks omitted)).

 We review a trial court's order on class certification for

abuse of discretion. Id. at 506. However, we apply a de novo

standard of review when evaluating a trial court's decision on a

question of law. Int’l Union of Operating Eng'rs Local No. 68

Welfare Fund v. Merck & Co., Inc., 192 N.J. 372, 386 (2007); see

also Beegal v. Park W. Gallery, 394 N.J. Super. 98, 111 (App.

 12 A-3485-14T3
Div. 2007) (trial court's legal determinations relevant to class

certification are reviewed de novo).

 Under our court rules, the party seeking class action

certification must first satisfy the general prerequisites for

maintaining a class action in Rule 4:32-1(a), which provides

that:

 One or more members of a class may sue or be
 sued as representative parties on behalf of
 all only if (1) the class is so numerous
 that joinder of all members is
 impracticable, 2) there are questions of law
 or fact common to the class, 3) the claims
 or defenses of the representative parties
 are typical of the claims or defenses of the
 class, and 4) the representative parties
 will fairly and adequately protect the
 interests of the class.

These factors are commonly referred to as numerosity,

commonality, typicality and adequacy of representation. Lee,

supra, 203 N.J. at 519.

 The party seeking class certification also must meet the

criteria of Rule 4:32-1(b), which requires, among other things,

that the court find "the questions of law or fact common to the

members of the class predominate over any questions affecting

only individual members, and that a class action is superior to

other available methods for the fair and efficient adjudication

of the controversy." R. 4:32-1(b)(3). This subsection of the

rule requires "the party seeking certification [to] demonstrate

both predominance of the common issues and superiority of a

 13 A-3485-14T3
class action over other trial techniques." Muise v. GPU, Inc.,

371 N.J. Super. 13, 30 (App. Div. 2004).

 To establish predominance, a plaintiff must demonstrate

that "the proposed class is 'sufficiently cohesive to warrant

adjudication by representation.'" Iliadis v. Wal-Mart Stores,

Inc., 191 N.J. 88, 108 (2007); Amchem Prods., Inc. v. Windsor,

521 U.S. 591, 623, 117 S. Ct. 2231, 2249, 138 L. Ed. 2d 689, 712

(1997). In determining whether a plaintiff has satisfied this

requirement, the trial court should "conduct a pragmatic

assessment of various factors," including an inquiry as to: 1)

"the significance of the common questions," which "involves a

qualitative assessment of the common and individual questions

rather than a mere mathematical quantification of whether there

are more of one than the other"; 2) "whether the benefit of

resolving common and presumably some individual questions

through a class action outweighs doing so through individual

actions"; and 3) "whether a class action presents a common

nucleus of operative facts." Lee, supra, 203 N.J. at 519-20

(citation and internal quotation marks omitted).

 The court also must determine whether a class action is

superior to other trial techniques. Id. at 520. This decision

"involves considerations of fairness to the putative class

members and the defendant, and the 'efficiency' of one

adjudicative method over another." Ibid. (citing In re Cadillac

 14 A-3485-14T3
V8-6-4 Class Action, 93 N.J. 412, 436 (1983)). Finally, the

court must consider the manageability of a class action. Ibid.

"Managing a state-wide class action almost always will be a

difficult undertaking because '[c]omplexity is an inherent trait

of class litigation.'" Ibid. (quoting Iliadis, supra, 191 N.J.

at 117-18).

 In making the predominance, superiority and manageability

assessment, "a certifying court must undertake a 'rigorous

analysis' to determine if the Rule's requirements have been

satisfied." Iliadis, supra, 191 N.J. at 106-07 (citation

omitted). The certifying court "must understand and analyze the

'claims, defenses, relevant facts, and applicable substantive

law' in determining whether a class action: (1) presents common

issues of fact and law that predominate over individual ones,

(2) is a superior means of achieving efficient and just results,

and (3) is manageable." Lee, supra, 203 N.J. at 505-06 (quoting

Iliadis, supra, 191 N.J. at 107).

 III.

 TGIF contends plaintiffs failed to establish the

predominance requirement of Rule 4:32-1(b)(3) with regard to the

claims under the CFA.

 A CFA claim brought by a consumer "requires proof of three

elements: '1) unlawful conduct by defendant; 2) an ascertainable

loss by plaintiff; and 3) a causal relationship between the

 15 A-3485-14T3
unlawful conduct and the ascertainable loss.'" Manahawkin

Convalescent v. O'Neill, 217 N.J. 99, 121 (2014) (quoting

Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009)). "'A

plaintiff who proves all three elements may be awarded treble

damages, "attorneys" fees, filing fees and reasonable costs of

suit.'" Id. at 121 (quoting N.J.S.A. 56:8-19).

 An ascertainable loss "is one that is 'quantifiable or

measurable,' not 'hypothetical or illusory.'" D'Agostino v.

Maldonado, 216 N.J. 168, 185 (2013) (quoting Thiedemann v.

Mercedes-Benz USA, L.L.C., 183 N.J. 234, 248 (2005)). A consumer

may establish an ascertainable loss if he or she suffers an out-

of-pocket loss. Lee, supra, 203 N.J. at 522. Furthermore, the

consumer must "demonstrate that he or she suffered an

ascertainable loss 'as a result of' the unlawful practice." Id.

at 522 (quoting N.J.S.A. 56:8-19 (emphasis added)). The

statutory phrase "as a result of" connotes a "causal nexus

requirement." Bosland, supra, 197 N.J. at 557-58.

 Here, plaintiffs allege they suffered ascertainable losses

as a result of TGIF's alleged unlawful conduct, specifically,

its failure to list prices on its menus for certain beverages.

Plaintiffs allege TGIF's practice violates N.J.S.A. 56:8-2.5,

and constitutes an unconscionable commercial practice in

violation of N.J.S.A. 56:8-2. However, in order to obtain

damages, each plaintiff must show that he or she sustained an

 16 A-3485-14T3
ascertainable loss and that the alleged unlawful conduct caused

the loss.

 In this case, plaintiffs failed to show that common issues

of fact as to whether TGIF's customers who purchased unpriced

soda, beer or mixed drinks predominate over issues that pertain

to individual class members. The class definition approved by

the trial court assumes that any patron at a TGIF company-owned

restaurant who purchased those beverages sustained an out-of-

pocket loss "as a result of" TGIF's failure to list prices for

these items on the menu. The court's analysis fails for several

reasons.

 The class definition erroneously includes all persons who

purchased an unpriced soda, beer or mixed drink regardless of

whether they reviewed the menu before purchasing the beverages.

However, a person cannot establish that he or she sustained an

ascertainable loss caused by TGIF's alleged unlawful conduct

unless that person reviewed the beverage section of the menu

before making the purchase. If a person did not look at the

beverage section of the menu, TGIF's failure to list prices on

the menu had no causal nexus to the person's decision to

purchase a particular beverage.

 Furthermore, based upon this record, we must assume some

persons who purchased a soda, beer or mixed drink at a TGIF-

owned restaurant in the period at issue made decisions as to

 17 A-3485-14T3
whether to order those beverages that had nothing whatsoever to

do with whether the prices were listed on the menu. For example,

a patron may have asked the price before ordering a soda, beer,

or mixed drink. If so, the patron would have been informed of

the price of the beverage before purchasing it.

 In this regard, we note that Fox claims one of TGIF's

servers misinformed him of the prices of certain beverages that

he purchased. There is, however, no evidence that TGIF's servers

routinely misinformed customers as to the prices of beverages,

or that it was TGIF's practice to have its servers tell

customers one price and charge them a higher price later. In any

event, Fox's experience confirms that some TGIF patrons ask the

price of a beverage before purchasing it.

 In addition, some of the persons who purchased a soda, beer

or mixed drink at company-owned TGIF restaurants in the relevant

period may have previously patronized one of TGIF's restaurants

and knew the prices that would be charged for these beverages.

Patrons also may have assumed the prices they would be charged

based on prices charged in other restaurants. Thus, the absence

of menu pricing for soda, beer and mixed drinks would not have

had any effect upon the decisions of these patrons to purchase

these beverages.

 Plaintiffs allege, based on certain marketing studies and

tests, that TGIF patrons will spend an average of $1.72 more on

 18 A-3485-14T3
beverages if the prices are not listed on the menu.2 However,

even if this allegation is proven, it would not establish that

all persons who purchased soda, beer and mixed drinks at TGIF-

owned restaurants spent more on these beverages because prices

were not listed on the menus. As we have explained, a patron may

have chosen to purchase a particular beverage on a specific date

for any number of reasons that have nothing to do with the lack

of menu pricing.

 We also note that Dugan claims she was charged $2.00 for a

beer at the bar and was later charged $3.59 for the same beer at

a table in the restaurant. Dugan asserts that the bar price was

the price charged during "happy hour." Although Dugan may have

been misled to believe she would be charged the "happy hour"

price for both drinks, that may not be so as to other patrons

who made similar purchases.

 We are therefore convinced that, with respect to the claims

under the CFA, the trial court erroneously found that issues of

fact common to members of the class predominate over issues that

affect individual class members. The court therefore erred by

allowing these claims to be maintained as a class action.

 The decision in International Union of Operating Engineers,

2 We note that TGIF asserts that plaintiffs have misinterpreted
the studies and tests. TGIF also asserts that there is no
evidence that TGIF acted or relied upon these studies and tests.

 19 A-3485-14T3
supra, 192 N.J. 372, supports our conclusion. In that case, the

plaintiff, a third-party payor of a healthcare benefits plan,

brought an action against the defendant, the manufacturer of the

prescription drug Vioxx, alleging it violated the CFA by

engaging in a fraudulent marketing campaign that induced "third-

party payors to accord Vioxx preferred status in their

formularies." Id. at 381.

 In reversing the grant of class certification, the Supreme

Court found that although each proposed class member received

the same information from the defendant, the class members did

not react "in a uniform or even similar manner." Id. at 390. The

Court stated that each third-party payor

 made individualized decisions concerning the
 benefits that would be available to its
 members for whom Vioxx was prescribed. The
 evidence about separately created
 formularies, different types of tier
 systems, and individualized requirements for
 approval or reimbursement imposed on various
 plans' members and, to some extent, their
 prescribing physicians, are significant.
 That evidence convinces us that the
 commonality of defendant's behavior is but a
 small piece of the required proofs. Standing
 alone, that evidence suggests that the
 common fact questions surrounding what
 defendant knew and what it did would not
 predominate.

 [Id. at 391.]

 Here, the "commonality" of TGIF's alleged unlawful conduct

is but "a small piece of the required proofs." Ibid. As we have

 20 A-3485-14T3
explained, there are numerous reasons why customers at TGIF-

owned restaurants may have purchased a soda, beer or mixed drink

in the relevant period, and whether the absence of menu pricing

caused those customers to sustain an ascertainable loss

cognizable under the CFA. Therefore, we conclude the court erred

by permitting plaintiffs to maintain a class action for the CFA

claims.

 Our decision in the earlier appeal does not require a

different conclusion. There, we held that Dugan had pled

sufficient facts to state a claim under the CFA, noting that the

appeal involved review of the denial of a motion to dismiss for

failure to state a claim, and the complaint had to be "parsed

generously." Dugan v. TGI Fridays, Inc., supra, slip op. at 18.

We held that, viewing the complaint indulgently, Dugan had

stated a claim under the CFA.

 However, we did not hold that all persons who purchased an

unpriced soda, beer or mixed drink at a TGIF-owned restaurant

necessarily sustained an ascertainable loss that was caused by

TGIF's alleged unlawful conduct. We also specifically declined

to address the issue of whether the matter should be certified

as a class action. Id. at 21-22.

 IV.

 TGIF further argues that plaintiffs failed to establish the

predominance requirement of Rule 4:32-1(b)(3) with respect to

 21 A-3485-14T3
the claims under TCCWNA.

 The purpose of the TCCWNA "is to prevent deceptive

practices in consumer contracts by prohibiting the use of

illegal terms or warranties in consumer contracts." Kent Motor

Cars, Inc. v. Reynolds & Reynolds Co., 207 N.J. 428, 457 (2011).

The TCCWNA provides in relevant part that:

 No seller . . . shall in the course of his
 business offer to any consumer or
 prospective consumer or enter into any
 written consumer contract . . . or display
 any written . . . notice or sign . . . which
 includes any provision that violates any
 clearly established legal right of a
 consumer or responsibility of a seller . . .
 as established by State or Federal law at
 the time the offer is made . . . or the . .
 . notice or sign is given or displayed.

 [N.J.S.A. 56:12-15.]

The TCCWNA also provides that any person who violates the

statute shall be liable to an aggrieved consumer for a civil

penalty of not less than $100, actual damages, or both at the

consumer's election, in addition to reasonable attorneys' fees

and court costs. N.J.S.A. 56:12-17.

 The TCCWNA does not create any new consumer rights, rather

"[t]he rights, remedies, and prohibitions conferred by the

TCCWNA are 'in addition to and cumulative of any other right,

remedy or prohibition accorded by common law, Federal law or

statutes of this State.'" Shelton v. Restaurant.com, Inc., 214

N.J. 419, 428 (2013) (quoting N.J.S.A. 56:12-18).

 22 A-3485-14T3
 In the earlier appeal, we held that Dugan had alleged

sufficient facts to state a claim under the TCCWNA. Dugan v. TGI

Fridays, Inc., supra, slip op. at 18-20. We found that the

omission of prices from TGIF's menu qualified as an "affirmative

act" under the TCCWNA because that practice violated N.J.S.A.

56:12-15. Id. at 19. We also found that Dugan was a "consumer"

under the statute, and that "the affirmative act that may

trigger the TCCWNA is the offer encompassed by TGIF's menu." Id.

at 20.

 Here, TGIF argues that plaintiffs cannot establish

predominance under Rule 4:32-1(b)(3) for the TCCWNA claims

because "each individual class member will be required to

demonstrate that he or she was provided with a menu that

violates the law[.]"

 Plaintiffs allege that TGIF instructs its servers to hand

opened menus to all patrons. However, if TGIF gave its servers

such instructions, they may not have been always followed. For

example, a server may have forgotten to provide the menu to a

customer, or a patron may have told the server a menu was not

required. Individualized inquiries would be required to

determine whether each class member was handed a menu that

lacked beverage pricing.

 Furthermore, claims for "actual damages" pursuant to

N.J.S.A. 56:12-17 would necessarily involve individual inquiries

 23 A-3485-14T3
to determine whether each class member sustained a loss caused

by the absence of beverage pricing on TGIF's menus. Those

inquiries would be similar to the individual inquiries required

to determine whether the class members sustained losses

recoverable under the CFA.

 We therefore conclude that with regard to their claims

under the TCCWNA, plaintiffs have not established that issues of

fact common to the members of the class predominate over issues

that only affect individual class members. We conclude the court

erred by allowing plaintiffs to maintain a class action to

pursue these claims.

 In view of our decision, we need not consider TGIF's other

arguments regarding the class certification, or plaintiff's

contention that the court erred by excluding certain TGIF

patrons and purchases from the class.

 Accordingly, the trial court's orders of December 23, 2014

and February 13, 2015, are reversed, and plaintiffs' cross-

appeal is dismissed. The matter is remanded to the trial court

for further proceedings on plaintiffs' individual claims. We do

not retain jurisdiction.

 24 A-3485-14T3